***National Labor Relations Board***
**OFFICE OF THE GENERAL COUNSEL**
**Advice Memorandum**

**DATE:** March 24, 1998

**TO:** James J. McDermott, Regional Director, Region 31

**FROM:** Barry J. Kearney, Associate General Counsel, Division of Advice

**SUBJECT:** Teamsters, Local 166 (Shank Balfour/Beatty), Case 31-CE-212

584-5056

This Section 8(e) case was submitted for advice on whether the transportation of construction materials between two jobsites four miles apart constitutes on-site work within the meaning of the Section 8(e) construction industry proviso.

We conclude, in agreement with the Region, that this delivery work falls outside the 8(e) proviso.

The Board explained the purpose and scope of the 8(e) proviso in Joint Council of Teamsters, No. 42 (California Dump Truck Owners Ass'n).1 In Joint Council, the bargaining agreement defined on-site work as the hauling of materials up to 10 miles away, and also required the signatory employer to terminate the employment of owner-operators who failed to become union members. The union contended, based on the contract, that owner-operator dump truck drivers who hauled dirt and other material from the employer's construction site to a variety of other employer-controlled construction projects up to 10 miles away must join the union. The dump truck drivers ordinarily remained in their vehicles and did not converse with any employees on the site. Assuming a 10-mile round-trip, the Board calculated that a dump truck driver would spend approximately 10 minutes loading and off-loading, and 50 minutes traveling off-site. The Board held that the 8(e) proviso did not apply to the dump truck drivers, even though "the transportation activity [took] place between and involve[d] brief work on two sites controlled by the same construction contractor."2 It noted that "[t]he primary purpose of the construction industry proviso - to avoid tensions among groups of employees at the same site - has little relevance to persons having such incidental contact with the site." Id. at 816.

In reaching this conclusion, the Board expressly relied on several earlier decisions which focused on the purpose of the work performed and its relationship to the jobsite. For example, the Board cited Teamsters, Local 631 (Reynolds Elec. and Eng'g Co.).3 which held that drivers who exclusively delivered drilling equipment to a construction site did not perform on-site construction work within the meaning of 8(e) where they performed no construction work and possessed no skills to perform such work. Instead, the Board concluded that their limited "onsite tasks were but an inseparable extension of the total delivery process."4

In reaching this conclusion in Joint Council, the Board expressly did not decide whether inter-site delivery work may include some off-site work in different circumstances:

We leave open the question whether, if ever, the definition of job-site work under the proviso may include the brief and incidental transportation of materials between two proximate, but not physically contiguous geographical, sites of construction, each of which is exclusively controlled by the same contractor. Id. at 817 n.33.

EXHIBIT 2

By contrast, the 8(e) proviso will apply where the driver's work consists of more than the transportation of materials and supplies. In Cahill Trucking Co.,5 for example, drivers who delivered pipe bedding material to the jobsite and hauled away waste materials also performed backfilling on the construction site, as well as "whatever else [the contractor] needed [them] for." The ALJ concluded that the on-site construction activities were not de minimis, as the drivers sometimes spent entire days performing such work. Consequently, the construction industry proviso of Section 8(e) was applicable.6

We assume, arguendo, that the Robertson's Ready Mix storage site for cement segments is a construction site within the 8(e) proviso. The disputed work here is comparable to that performed in Joint Council. The owner-operator truck drivers' exclusive task was to transport cement segments from the Robertson's Ready Mix site four miles distant to the Employer's jobsite. Since the drivers' only activity on either jobsite was to await the loading and unloading of the cement segments, during which time they ordinarily did not even leave their trucks, there can be no argument that their on-site duties were more than de minimis, as in Cahill Trucking and Stief Co. It appears that the drivers had only the merest incidental contact with the jobsites and the construction work being performed there. As in Reynolds Elec., the only contact that the drivers had with the jobsites was during loading and unloading, which was but the beginning and end of the transportation process.7 Moreover, the two sites are not in close proximity, nor "exclusively controlled by the same contractor." Thus, this case does not present the issue left open in Joint Council, supra, at note 3.

B.J.K.

---

1 248 NLRB 808 (1980), enf'd, 702 F.2d 168 (9th Cir. 1981), cert. denied, 459 U.S. 1193 (1983).

2 Id. at 815-16. See also Associated General Contractors of California, Inc., 280 NLRB 698, 701 n.9 (1986) (union did not contend that the construction industry proviso of Section 8(e) applied to owner-operator dump truck drivers who hauled dirt between two construction sites, some of which were controlled by the same contractor).

3 154 NLRB 67, 95-96 (1965), cited in Joint Council, 248 NLRB at 816 n.3.

4 Id. See also Teamsters, Local 294 (Clemence D. Stanton d/b/a/ Rexford Sand and Gravel Co.), 195 NLRB 378, 381-82 (1972) (delivery of sand to jobsite held to be off-site work although some part of the delivery took place on the jobsite); Teamsters, Local 294 (Island Dock Lumber, Inc.), 145 NLRB 484, 491 (1963) (cement mixing on jobsite constituted the final act of delivery of the materials, which is not exempt from Section 8(e)), enf'd, 342 F.2d 18 (2d Cir. 1965). These cases were cited by the Board in Joint Council, 248 NLRB at 815 nn.24, 27.

5 277 NLRB 1286, 1289-90 (1985).

6 Id. at 1290. See also Operating Engineers, Local 12 (Stief Co. West), 314 NLRB 874, 877 (1994) (Section 8(e) proviso applicable to drivers whose "principal task" was to operate the boom truck on the jobsite, involving the hoisting, lowering, placement, and removal of steel forms integral to the construction of barrier walls).

7 See also Teamsters Local 284 (Complete General Construction Co.), Case 9-CC-1581, Advice Memorandum dated December 23, 1996.

***National Labor Relations Board***
**OFFICE OF THE GENERAL COUNSEL**
**Advice Memorandum**

**DATE:** February 2, 1996

**TO:** Rosemary Pye, Regional Director, Region 1

**FROM:** Barry J. Kearney, Associate General Counsel, Division of Advice

**SUBJECT:** Todesca Corp., Case 1-CA-32469

590-2575

This 8(a)(5) and (1) charge was submitted for advice as to whether the Employer's drivers perform sufficient construction work within the meaning of Section 8(f) to render lawful their representation by the Union on a pre-hire basis and, if so, whether the Employer unlawfully refused to bargain with the Union over its decision to dispose of most of its trucks and lay off drivers and/or over the effects of that decision.

Facts

The facts relevant to the above-stated issue are as follows: The Employer owns and operates, at three separate locations in Rhode Island, a rock quarry, a sand and gravel pit, and an asphalt plant. Historically, it has also operated as a contractor performing road and highway construction. The Union has represented the Employer's drivers for over 40 years. Prior to the events which gave rise to the instant charge, about 35 drivers had been employed by the Employer during the peak of the construction season. The Union has never been certified as the representative of the drivers; nor is there any evidence, other than that which may arise from the collective bargaining agreement itself, that the Union ever achieved majority support in the unit. The multi-employer collective bargaining agreement is and, as far as is known, has always been an area agreement ("all highway and heavy construction performed by the Employer" within Rhode Island). The collective bargaining agreement has a 7-day union security clause and hot-cargo provisions. The term of the current collective bargaining agreement runs from May 1, 1994 until April 30, 1997.

Historically, the Employer's drivers have performed the following work. They have hauled sand and gravel from the Employer's pit and rocks from its quarry to its asphalt plant. The Employer sells its sand, gravel, rocks, and asphalt to third party customers. With few exceptions, deliveries of these products have been arranged by those customers and have not involved the Employer's vehicles or drivers. In the case of one exception, Durastone, a single driver of the Employer has hauled asphalt from the Employer's plant to the Durastone facility in Rhode Island, where it is processed further. In the winter, the Employer's drivers delivered the sand used by the State of Rhode Island for road sanding. The Employer also used asphalt it produced in its road and highway construction operations. This asphalt was hauled by the Employer's drivers from the plant to the jobsite where the drivers would empty the asphalt into a paver (driven by an operator represented by the Operating Engineers) as it paved the road. This is the only regular work which the Employer's drivers ever perform in connection with the Employer's construction operations and the parties dispute whether it constitutes construction work within the intent of Section 8(f). The Union contends that it is and the Employer contends that it is not. It is undisputed that on infrequent and irregular occasions the Employer's drivers have been called upon to move a pile of material of some sort from one location on the jobsite to another and that this work constitutes construction work within the meaning of Section 8(f).

It is also undisputed that the laborers and the operating engineers whom the Employer employs on its road

and highway jobsites are exclusively engaged in construction work. Every year most of the Employer's drivers are laid off by the close of the construction season in the late fall and their recall starts at the resumption of the construction season in the following March or April. The contract has no hiring hall provisions; instead, it requires the Employer to call back by seniority the drivers whom it has previously laid off. Typically, a few drivers are kept working on and off over the winter in connection with such things as the Employer's contracts to provide sand for road sanding.

Action

As recommended by the Region, the charge should be dismissed on the basis that the Employer's drivers are not engaged in the building and construction industry under Section 8(f) of the Act and therefore the Union's representation of them pursuant to a pre-hire 8(f) contract was not legitimate. Accordingly, the 8(a)(5) and (1) charge must be dismissed because of the Union's lack of 9(a) representative status. See Brannan Sand & Gravel Co., 289 NLRB 977, 979.

Section 8(f) states in relevant part: "It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members...." Thus, the 8(f) statutory requirements are as follows:

(1) the agreement must cover employees who are engaged in the building and construction industry,

(2) the agreement must be with a labor organization of which building and construction employees are members, and

(3) the agreement must be with an employer engaged primarily in the building and construction industry. See Animated Displays Company, 137 NLRB 999, 1020-1021 (1962) and Carpet, Linoleum and Soft Tile Local Union No. 1247 (Indio Paint and Rug Center), 156 NLRB 951 (1966).

With regard to requirement 2, it would appear, and no one has contended to the contrary, that the Union involved herein (the Teamsters Union) has members who are employed as building and construction employees. As far as requirement 3 is concerned, there is insufficient evidence to decide this question. As noted in the Region's request for advice, it seems clear that the Employer's sand and gravel pit, rock quarry, and asphalt plant operations are in themselves material supply operations which do not qualify as being "in the building and construction industry" within the meaning of 8(f). Forest City/Dillon-Tecon, 209 NLRB 867, 870-872 (1974). Also, the deliveries which the Employer's drivers make from its pit and quarry to its asphalt plant and from the asphalt plant to the Employer's customers, such as Durastone, and the deliveries of sand to the road sanding operations of the State of Rhode Island, which are themselves not engaged in the building and construction industry, clearly do not constitute construction work within the meaning of 8(f). J. P. Sturrus Corp., 288 NLRB 668 (1988); St. John Trucking, 303 NLRB 723 (1991). However, the Employer is also engaged, at least to some degree, in the building and construction industry with regard to its road and highway operations. What is not clear is whether those operations, the road and highway construction, render the Employer "primarily engaged" in the building and construction industry. Since the evidence in the file does not allow a finding one way or the other, it will be assumed that the Employer is primarily engaged in the building and construction industry.

Accordingly, the issue becomes: Are the employees covered by the Union's collective-bargaining agreement engaged in the building and construction industry? If the answer is "No," then 8(f) is not applicable and the relationship between the Employer and the Union herein cannot be enforceable as a 9(a) relationship in view of the fact that the Union has never been certified as such, nor does it appear that the Employer ever

recognized the Union as anything other than an 8(f) representative.

While we have been unable to find any cases where the Board has specifically defined what it takes for employees to be "engaged...in the building and construction industry" within the meaning of 8(f), there are a number of cases which compel the conclusion that the drivers in the instant case would not be found to be performing "construction-site work" within the meaning of Section 8(e) of the Act. Thus, in Island Dock Lumber, Inc., 145 NLRB 484 (1963), the Board determined that the delivery of ready-mix concrete does not come within the construction industry proviso of 8(e). The Board noted that the pouring of concrete constituted the actual delivery because concrete by its very nature cannot be dumped on the ground at the construction site like other materials. Asphalt is of course like concrete in this regard. It cannot simply be dumped on the ground as it will harden into a large lump and be unusable. In Local 294 Teamsters (Rexford Sand and Gravel Co.), 195 NLRB 378 (1972), the Board held that dumping of sand at such places on construction sites as directed by construction site workers constituted merely the delivery of materials and supplies and did not constitute work at the site of construction exempted by the 8(e) "on-site" proviso. In Island Concrete Enterprises, 225 NLRB 209 (1976), the Board held that the transportation and delivery of ready-mix concrete and of precast concrete pipe for manholes constituted the transportation and delivery of supplies, materials, or products, and was not work to be performed at the site of construction as contemplated by 8(e), notwithstanding that the delivery of the precast concrete pipe involved the lowering of the sections of pipe and the placing of the pipe segments in position in the trench by the operation of a boom. Certainly, compared to these cases, the work performed by the asphalt delivery drivers in the instant case would likewise not be considered job-site construction work under 8(e) of the Act.

Turning to 8(f), as opposed to 8(e), cases, the Board in J. P. Sturrus Corporation, 288 NLRB 668 (1988), determined that an Employer which operated a quarry, batch plant, and delivery service for redi-mix concrete was not in the building and construction industry within the meaning of 8(f) of the Act, notwithstanding that its drivers occasionally would assist the contractor at the construction site with screening and spreading of the concrete, after they had poured it, when the contractor's own employees were unavailable. The Board held that these incidental tasks did not bring the Employer within the ambit of 8(f). The ALJ in the course of his discussion, which was affirmed by the Board with some modifications in other respects, cited Island Concrete Enterprises, supra, and Island Dock Lumber Co., supra, for the proposition that redi-mix concrete delivery companies are not engaged in the building and construction industry within the meaning of either 8(e) or 8(f) of the Act. This portion of the ALJ's decision was not modified in any way by the Board even though, as noted in the discussion of those cases above, both were 8(e), not 8(f), cases. Thus the Board in Sturrus found that such an employer was not engaged in the building and construction industry within the meaning of 8(f).

Accordingly, work at a construction jobsite by the unit employees involved is a necessary element for a finding of 8(f) applicability.[(1)] Here, there can be no such finding of jobsite work by the unit employees, the drivers, in view of cases such as Island Dock and Island Concrete. Moreover, the infrequent and irregular work of moving some materials from one part of a jobsite to another cannot be considered to be sufficient to make these drivers construction employees. Accordingly, the charge should be dismissed because the employees in the unit involved do not perform job-site work and thus cannot be considered to be, in the words of 8(f), "engaged (or who, upon their employment, will be engaged) in the building and construction industry."

B.J.K.

---

[1] See also Forest City/Dillon-Tecon Pacific, 209 NLRB 867 (1974).